UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHERRY C., <br><br> Plaintiff, <br><br> v. <br><br> MARTIN O'MALLEY, <br> COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | No. 21 CV 4022 <br><br> Magistrate Judge McShain |

### MEMORANDUM OPINION AND ORDER

Plaintiff Sherry C. appeals the Commissioner of Social Security's decision denying her application for benefits. For the following reasons, plaintiff's motion to reverse or remand [13] is granted, defendant's motion for summary judgment [16] is denied, and the case is remanded for further administrative proceedings.[1]

### Background

In January 2017, plaintiff applied for a period of disability and disability insurance benefits with an alleged onset date of February 8, 2015. [10-1] 171. The claim was denied initially, on reconsideration, and, following a May 2019 hearing with an administrative law judge (ALJ), in the ALJ's written decision of July 30, 2019. [*Id.*] 171-81. The Appeals Council vacated the ALJ's decision and remanded for a new hearing. [*Id.*] 189-90. After that hearing, the ALJ issued a written decision on January 29, 2021 denying plaintiff's claim. [*Id.*] 13-34. The Appeals Council denied review in May 2021, making the ALJ's decision the agency's final decision. *See* 20 C.F.R. §§ 404.955 & 404.981. Plaintiff then appealed to this Court [1], and the Court has subject-matter jurisdiction pursuant to 42 U.S.C. § 405(g).[2]

The ALJ reviewed plaintiff's disability claim in accordance with the Social Security Administration's five-step sequential-evaluation process. At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since her

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except for citations to the administrative record [10], which refer to the page numbers in the bottom right corner of each page.

[2] The parties have consented to the exercise of jurisdiction in this case by a United States Magistrate Judge. [5, 8].

alleged onset date. [10-1] 16. At step two, the ALJ determined that plaintiff has the following severe impairments: osteoarthritis of the bilateral hips, episodic migraines with associated vertigo, and right sided hearing loss. [*Id.*]. At step three, the ALJ ruled that plaintiff's impairments did not meet or equal the severity of a listed impairment. [*Id.*] 16-17. Before turning to step four, the ALJ found that plaintiff had the residual functional capacity (RFC) to perform sedentary work, except that plaintiff could never climb ladders, ropes, or scaffolds; she could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; she should work in moderate or quieter noise settings; she should avoid work hazards, including unprotected heights and moving, dangerous machinery; she should avoid work with vibrating tools and work surfaces; and she can work at temperature-controlled work environments but not in extreme temperatures. [*Id.*] 17. At step four, the ALJ found that plaintiff could perform her past relevant work as an office manager. [*Id.*] 33-34. Because that finding meant that plaintiff was not disabled, the ALJ denied the claim without proceeding to step five.

## Legal Standard

The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). "When reviewing a disability decision for substantial evidence, we will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination so long as substantial evidence supports it." *Warnell v. O'Malley*, 97 F.4th 1050, 1052-53 (7th Cir. 2024) (internal quotation marks and brackets omitted).

## Discussion

Plaintiff argues that the ALJ failed to properly evaluate the opinion of her neurologist, Dr. Thomas Burnstine, under the treating-physician rule that applied in this case. [13] 13-15.

"A treating source's opinion in cases filed before March 27, 2017, is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." *Heidi R. v. Kijakazi*, No. 20 CV 5617, 2023 WL 7130374, at *3 (N.D. Ill. Oct. 30, 2023). "This rule is premised on the treating physician's greater familiarity with the claimant's condition and the progression of [her] impairments[.]" *D.K.H. v. Saul*, No. 19-cv-7755, 2021 WL 2566768, at *3 (N.D. Ill. Jun. 23, 2021). Once contrary evidence is introduced, however, "a treating physician's opinion becomes just one piece of evidence for the ALJ to evaluate, and the ALJ must then analyze various

2

factors in deciding the weight to afford it, if any." *Heidi R.*, 2023 WL 7130374, at *3. These factors include the length, nature, and extent of the treatment relationship; the frequency of examination; the physician's specialty; the types of tests performed; and consistency with and support for the opinion in the record. 20 C.F.R. § 404.1527(c). "An ALJ must give good reasons for discounting the opinion of a treating physician." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (internal quotation marks omitted). Although the ALJ need only "minimally articulate" these reasons, the ALJ "must still support his conclusions with substantial evidence." *Stocks v. Saul*, 844 F. App'x 888, 892 (7th Cir. 2021).

Dr. Burnstine treated plaintiff for migraines and associated vertigo from at least June 2017 through May 2020. *See* [10-1] 562-64 (June 15, 2017 treatment note); [*id.*] 27 (ALJ discussing Dr. Burnstine's May 26, 2020 treatment notes). On May 3, 2019, Dr. Burnstine completed a "Physical Residual Functional Capacity Statement" that addressed the work-related limitations caused by plaintiff's migraines. [10-2] 909-12. According to Dr. Burnstine, plaintiff experienced head pain due to migraines that lasted between six and eight hours and occurred as often as four days per week. [*Id.*] 909. Burnstine opined that plaintiff's pain was severe enough to occasionally interfere with the attention and concentration needed to perform simple work tasks. [*Id.*]. Dr. Burnstine further opined that plaintiff "can work well" on "most days," but also had a "variable" need to lie down if she experienced a migraine and was likely to be off-task for 15% of an eight-hour workday. [*Id.*] 910, 912. Burnstine also opined that plaintiff would be unable to obtain and retain work in a competitive work environment "if she has [a] migraine." [*Id.*] 912.

The ALJ's RFC determination did not include a restriction for off-task time, a variable need to lie down, or an impaired ability to sufficiently pay attention and concentrate to complete simple work. This was because, according to the ALJ, Dr. Burnstine's opinion was entitled to only "some weight":

> At first glance, this opinion appears to be limited in scope by the claimant and/or her representative in an effort to slant Dr. Burnstine's opinion and provide a less than full assessment of the claimant's abilities. The document clearly contains handwriting from at least two different people, with portions filled in or crossed out after the fact. This renders it somewhat suspect. Additionally, it should be noted the undersigned considered a letter requesting medication coverage from the insurance provider at 18F, page 1, which is signed by Dr. Burnstine, but clearly authored by a medical assistant, a non-medically acceptable source. It seems possible that other medical staff completes the doctor's forms and to what extent his actual medical judgment is accurately reflected is unknown. However, the undersigned finds that the claimant can likely perform sedentary work with some environmental and postural limitations so as not to trigger the claimant's migraine

3

> headaches and resultant vertigo. This is supported by the rest of the record, which indicates that the claimant should avoid a job where she is required to stand and walk for extended periods, and is capable of managing most tasks in the absence of headaches (Exhibits 2F, 5F, 8F). Moreover, Dr. Burnstine's recent notes from 2019 to 2020 documented intact findings on exam (i.e., normal neurologic, mental and gait exams) with no significant changes to prescribed treatment, except for the Botox injections, which the claimant has not yet pursued (23F). Therefore, this is accorded some weight.

[10-1] 31-32.

The Court concludes that multiple errors in the ALJ's evaluation of Dr. Burnstine's opinion require a remand.

First, it is unclear whether or to what extent the ALJ evaluated Burnstine's opinion in accordance with the treating-physician rule. Most obviously, the ALJ "altogether failed to address whether Dr. [Burnstine's] medical opinions are supported by medically acceptable clinical and laboratory diagnostic techniques." *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009). Nor did the ALJ consider Dr. Burstine's specialty or the frequency with which he examined plaintiff. *See Jaquelyn L. v. Kijakazi*, No. 19 C 4223, 2022 WL 1620129, at *7 (N.D. Ill. May 23, 2023) (remanding based on ALJ's misapplication of treating-physician rule where ALJ "omitted any discussion of the fact that Dr. Rao was plaintiff's treating oncologist, the doctor who coordinated all of her cancer treatment from July 2016 through September 2017"). And while the ALJ appears to have considered whether Dr. Burnstine's opinion was consistent with and supported by his treatment notes from 2019 and 2020, the Court explains below that substantial evidence does not support any finding that the opinion was inconsistent with or unsupported by the doctor's treatment notes.

Second, and contrary to the Commissioner's argument, *see* [17] 7, it is readily apparent that the ALJ discounted the opinion based on several dubious and highly speculative suppositions. To begin, the ALJ surmised that plaintiff and/or her representative had intentionally limited the "scope" of Dr. Burnstine's opinion so that Burnstine would "provide a less than full assessment of the claimant's abilities." [10-1] 31. The ALJ did not explain what she meant by that, nor is it obvious to the Court how or why the ALJ drew such a conclusion, so this "reason" is dismissed as pure speculation. *Cf. Rockwell v. Saul*, 781 F. App'x 532, 537 (7th Cir. 2019) ("[T]he ALJ's notion that treating physicians such as Dr. Smith lie about their patients' capabilities is based on nothing but speculation and a general suspicion of treating physicians. Nothing in the record backs this up."). The ALJ also stated that Dr. Burstine's opinion was "somewhat suspect" because the document containing his findings "clearly contains handwriting from at least two different people, with portions filled out after

4

the fact." [10-1] 31. The ALJ even suggested it was "possible" that "other medical staff completes the doctor's forms and to what extent his actual medical judgment is accurately reflected is unknown." [*Id.*]. But the one page of the record that the ALJ cited to support this theory undermines it. The ALJ pointed to the fact that a medical assistant in Dr. Burnstine's office prepared a letter for plaintiff's insurer–a letter that was, admittedly, signed by Burnstine–requesting coverage for plaintiff's Aimovig injections, which were "started in Oct 2018" and led to some "improvement." [10-2] 913. Yet Dr. Burnstine's own notes corroborate every factual assertion in the letter: (1) Burnstine had treated plaintiff for migraines for over a year, *see* [10-2] 914 (plaintiff was "an established patient" as of July 24, 2018); (2) plaintiff had tried Aleve, Advil, Duloxetine, Nortriptyline, and Propanolol, but continued to experience regular migraines, *see* [*id.*] 917 (documenting plaintiff's use of these medications and her ongoing migraines); (3) plaintiff had started Aimovig injections and experienced some improvement, *see* [*id.*] 920 (plaintiff's migraines were not debilitating after Aimovig injection); and (4) plaintiff had experienced an interruption in Aimovig due to issues with her insurer, *see* [*id.*] 927-33. The idea that Dr. Burnstine's treatment notes did not reflect his own medical judgment was thus the purest of conjecture, and "[a]n ALJ's conjecture is never a permitted basis for ignoring a treating physician's views[.]" *Moss*, 555 F.3d at 560.

Third, the ALJ's apparent finding Dr. Burnstine's treatment notes from 2019 and 2020 were inconsistent with or did not support his opinion–specifically, his opinion that plaintiff's migraines would interfere with her attention and concentration, cause her to be off-task for 15% of the workday, and require a variable period of lying down–has no substantial evidentiary support. Even accepting the ALJ's characterization of Dr. Burnstine's notes as reflecting "intact" neurological findings, those notes unambiguously demonstrate that plaintiff experienced severe, recurring migraine despite Burnstine's efforts to treat them with different medications. The July 1, 2019 treatment note reflects that Dr. Burnstine previously treated plaintiff's headaches with Duloxetine, which initially resolved "all headaches and vertigo." [10-2] 1084. However, plaintiff continued to experience "headache and vertigo 1/week"; these migraines were "milder", but only because they lasted "6-8 hours instead of 24 hours or more," and plaintiff was not experiencing brain fog. [*Id.*] 1084-85. Plaintiff began receiving Aimovig injections in or around March 2019, which "helps her" because "[t]he migraine[s] are not as severe for the first 2 weeks" after the injection, "but the migraines return as before for the last 2 weeks." [*Id.*] 1086. According to a November 2019 treatment note, plaintiff reported that "Aimovig still helps but not as much" and that she had "3-4 migraines per week" or "7 migraines per week." [*Id.*] 1088. Dr. Burnstine assessed plaintiff with "intractable migraine without aura" and recounted that plaintiff experienced only "partial relief with Aimovig." [*Id.*] 1089. Burnstine discussed "alternative medication" with plaintiff, and plaintiff said she would consider Botox. [*Id.*]. In February 2020, plaintiff reported that she did not have Aimovig "for awhile" and had a "3 day severe migraine" and "[v]ertigo since then"; plaintiff also believed she was not thinking clearly. [*Id.*] 1091.

5

Dr. Burnstine noted that plaintiff would continue using Aimovig and referred her to a pain specialist, Dr. Jay Hurh, for Botox injections. [*Id.*]. At a March 2020 evaluation, Dr. Hurh found that plaintiff "does meet criteria for Botox injection for migraine headaches" because she had "failed multiple medications" and only one of those medications "provid[ed] some relief." [*Id.*] 1097. In May 2020, plaintiff reported during a telephone virtual appointment with Dr. Hurh that "[s]he did not get Botox because of the pandemic. She is not going out because she stated she is immunocompromised." [*Id.*] 1100. Dr. Hurh prescribed Memantine for migraine prevention. [*Id.*] 1102.

The treatment notes provide no substantial support for the ALJ's apparent determination that Dr. Burnstine's opinion was either inconsistent with, or unsupported by, the treatment record. To the contrary, the treatment notes demonstrate that plaintiff's migraines persisted despite multiple medication changes and were sufficiently intractable that Dr. Burnstine and Dr. Hurh agreed that Botox treatment was warranted. By any measure, this was an apparently "significant" change in plaintiff's medication regimen because her insurer previously indicated it would not cover Botox until plaintiff first "failed" other medications. *See, e.g.*, [10-2] 923. The ALJ acknowledged this significant change, but apparently dismissed it because plaintiff had "not yet pursued" the Botox treatment by the time of the hearing. [10-1] 32. Plaintiff explained, however, that it was the arrival of the Covid-19 pandemic that caused her not to seek Botox treatment in May 2020 because she was immunocompromised. [10-2] 1100. It is unclear how–or whether–the ALJ considered that fact in weighing Dr. Burnstine's opinion. *Cf. Jose V. v. Kijakazi*, No. 21 CV 896, 2023 WL 8934938, at *5 (N.D. Ill. Dec. 27, 2023) ("The ALJ must consider and address reasons for not pursuing treatment that are pertinent to an individual's case and explain how [she] considered the individual's reasons in [her] evaluation of the individual's symptoms."). Finally, while the ALJ observed that plaintiff's migraines were "well managed with current treatment," the ALJ also acknowledged that plaintiff "continues to experience headaches with vertigo" and that "she still has problems" despite experiencing some "improve[ment]." [10-1] 33. The Court therefore finds that the ALJ failed to build a logical bridge between Dr. Burnstine's treatment notes and her conclusion that Burnstine's opinion deserved only some weight. Indeed, the ALJ's reasoning simply does not address Burnstine's conclusion that, notwithstanding some improvement in her condition, plaintiff's recurring migraines would interfere with her attention and concentration, cause her to be off-task for up to 15% of a workday, and possibly require that she lie down at work if she experienced a migraine.

The Commissioner's arguments to the contrary lack merit. The Commissioner first argues that the ALJ reasonably "elevat[ed] other medical opinions over that of Dr. Burnstine." [17] 8. But two of the state agency reviewers who gave opinions–in May and August 2017, well before Dr. Burnstine was treating plaintiff's migraines in July 2018 and beyond–did not even address migraines. *See* [10-1] 145-53 (initial

6

review in May 2017); [*id.*] 156-65 (reconsideration review in August 2017).[3] What's more, the ALJ specifically rejected the reviewers' conclusions that plaintiff could perform light work based on the ALJ's review of additional evidence of plaintiff's dizziness that was submitted post-hearing. *See* [*id.*] 32 (giving "some weight" to agency reviewers' opinions but finding that plaintiff "is more appropriately limited to sedentary exertional work due to hip osteoarthritis and dizziness"). The ALJ also gave only "partial weight" to the opinion of Dr. Steven Goldstein, an independent medical expert who testified at the hearing. [*Id.*] 33. Relevant here, the ALJ cited the "new medical evidence submitted post hearing"–*i.e.* Dr. Burnstine's later treatment notes, which Goldstein did not review–as grounds for rejecting Dr. Goldstein's opinion that plaintiff could perform light work. [*Id.*]; *see also* [*id.*] 24 (acknowledging that additional records, including Dr. Burnstine's 2019-2020 treatment notes, were submitted after Dr. Goldstein testified). This, then, was not a case where the ALJ permissibly decided to credit one medical opinion on the severity and limiting effects of plaintiff's migraines over another, and the ALJ's supposed "elevati[on of] other medical opinions over that of Dr. Burnstine" is not a good reason to reject the treating neurologist's opinion. The Commissioner also argues that there were "contradictions between [Burnstine's] opinion and the doctor's own treatment notes," [17] 8, but these contradictions are not identified in the Commissioner's brief–or, more importantly, in the ALJ's decision.

In the end, there is grave doubt whether the ALJ even applied the treating-physician rule when evaluating Dr. Burnstine's opinion. The ALJ impermissibly speculated about the manner in which plaintiff obtained the opinion and, contrary to all indications, whether Dr. Burnstine's treatment notes reflected his own medical judgment. To the extent the ALJ found that Dr. Burnstine's opinion was inconsistent with, or unsupported by, his own treatment records, such a finding has no substantial basis in the evidence. As a result, the ALJ's RFC determination focused on "environmental and postural limitations so as not to trigger the claimant's migraines," [10-1] 31-32, but included no restrictions to account for the limitations that, according to Dr. Burnstine, would arise if and when plaintiff experienced a migraine at work. Because substantial evidence does not support the ALJ's handling of Dr. Burnstine's opinion, a remand is required.[4]

---

[3] The ALJ did not mention the opinion of a third agency reviewer whom the Commissioner relies on. *See* [10-1] 631 (July 9, 2018 opinion of Dr. Robysina James).

[4] Because this issue is dispositive, the Court does not reach plaintiff's other ground for remand.

7

## Conclusion

Plaintiff's motion to reverse or remand [13] is granted and defendant's motion for summary judgment [16] is denied. The decision of the Social Security Administration is reversed, and, in accordance with the fourth sentence of 42 U.S.C. § 405(g), this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

_____
**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: September 24, 2024**